**In the United States Bankruptcy Court
For the Eastern District of Pennsylvania**

| | |
|---|---|
| In re Robert W. Ishmael | : Chapter 7 |
| Debtor(s) | : Bankruptcy No. 05-16306 SR |
| Richard Nelson | : |
| Plaintiff | : |
| v. | : |
| Robert W. Ishmael | : |
| Defendant | : Adv. No. 07-287 |

# **Opinion**

By: Stephen Raslavich, United States Bankruptcy Judge.

*Introduction*

Before the Court is the Complaint of Richard Nelson in which he seeks to except his claim from the Debtor's discharge. The Debtor opposes such relief. A trial was held on October 21, 2008, after which the Court took the matter under advisement. For the reasons set forth below, judgment will be entered in favor of the Debtor.[1]

*The Record*

---

[1] Because this proceeding involves the dischargeability of a claim, it is within this Court's core jurisdiction. *See* 28 U.S.C. § 157(b)(2)(I)

The Plaintiff owned a 2001 Nissan.  He obtained insurance for that vehicle through the Debtor.  *See* Ex. C-3, C-4, C-5.  Because the Plaintiff had financed the purchase of that car, he was required by the lender to have comprehensive insurance coverage[2] in addition to liability coverage.[3]  Transcript (T-) 16.  The Debtor obtained that coverage for Plaintiff via a "split" policy.  This meant that liability coverage and property coverage were issued under separate policies and from different insurers.  T-19.  Liability coverage was provided by Nationwide and property coverage by Personal Surplus Lines, Inc. (PSL).  *Id.*

On October 24, 2002, PSL sent Debtor a payment notice.  The notice informed Debtor that his payment in the amount of $215.79 was due on November 14.  Ex. C-20; D-108.  The Plaintiff testified that two days prior to that due date, he contacted the Debtor to discuss making this payment.  T-22  The Plaintiff explained that he was out of town at the time and so could not make the payment by the due date without the Debtor's help.  *Id.*  To assist Plaintiff in making that payment on time, the Debtor faxed to him a power of attorney which he executed and sent back to Debtor.  Plaintiff also authorized Debtor to charge that

---

[2]In the insurance industry, comprehensive coverage insures a car against damage caused by a collision as well as losses not related to an accident (e.g., theft, fire, vandalism).  *See* www.insurance.com/article.aspx/Pennsylvania.

[3]Liability coverage is required by state law.  *See* 75 P.S. § 1786

2

payment to his credit card.  T-22; Ex. C-1.

This is not how Debtor remembers that conversation: he recalls that Plaintiff needed assistance in making the payment for his *liability* policy.  T-78  As it turns out, the Debtor paid the Plaintiff's liability premium and not the comprehensive premium.  Ex. C-2; D-104; T-79.  On November 14, 2002, PSL sent Plaintiff a notice of cancellation of his property coverage.  Ex. C-24; D-109.  Plaintiff claims never to have received that notice.  Ex. D-111, pp. 3-4.

One week later, Plaintiff traded in his Nissan for a Honda.  Ex. C-9.  As before, the Plaintiff financed this purchase and so needed comprehensive auto insurance coverage.  He testified that he called the Debtor from the Honda dealership to have the Debtor confirm that the Plaintiff had auto insurance coverage.  T-27  He recalled that the Honda sales representative asked the Debtor if the Plaintiff had "full, transferrable coverage" and the Debtor replied that transferring that insurance "[would not be] a problem.  T-28.  For his part, the Debtor recalls being asked if the Plaintiff had "current insurance" and he responded that he did.  T-84.  According to the Debtor, the conversation does not appear to have specified whether that coverage was limited to liability or also included property coverage as well; they spoke only in general terms.  *Id.*

3

After that conversation, Debtor prepared the necessary paperwork to transfer coverage to the new car.  The Debtor mailed one form for liability coverage to Nationwide.  Ex. C-15; D-105  He *faxed* another form for property coverage to PSL as per that company's requirement.  Ex. C-14; D-107; T-85.  PSL responded to that fax immediately to inform Debtor that the property damage policy had lapsed.  Ex. D-107; T-85,86,98.  Two things happened next: first, Debtor testified that he immediately informed Plaintiff *who was in his office at the time* that his property coverage had lapsed.  T-86.  Debtor further testified that Plaintiff responded that he would "take care of it." *Id.*  The Plaintiff denies being in the Debtor's office at all that day: he maintains he was at the Honda dealership the entire time.  T-26-27.  Second—and this is regardless of Plaintiff's whereabouts on that day—after being told that Plaintiff's comprehensive coverage had lapsed, the Debtor *never called the Honda sales rep back* to inform him of that fact.  T-98.  As a result, Plaintiff took delivery of the vehicle without the required insurance.  *Id.*

About one week later, Plaintiff's Honda was stolen. T-29 Plaintiff notified Nationwide and the Debtor of the loss.  *Id.* Nationwide informed the Plaintiff that the car was not insured for property damage.  T-30 On December 2, Nationwide informed Debtor of the same and sought confirmation that liability coverage was in force.  Ex. C-10  The Plaintiff next contacted

the Debtor for an explanation as to why the theft was not covered. T-30. Debtor explained that his property insurance coverage had lapsed due to non-payment. *Id.* The upshot of all of this is that PSL denied coverage of any claim for theft leaving Plaintiff liable to the lender (American Honda Finance) for the balance due on the car. T-35

On December 19, 2002, the Plaintiff sought review of PSL's cancellation of his policy. Ex. C-26 In May 2004, the Insurance Commissioner denied that request based on untimeliness. Ex. D-110. The Commissioner rejected Plaintiff's purported excuse that he had never received notice of cancellation from PSL. *Id*. To the contrary, the Commissioner found that he had received notice. *Id.* The result of all this is that the Plaintiff has been held liable by American Honda Finance for his loan balance. Ex. D-111. That, in turn, adversely affected his credit rating. T-35; Ex. D-111. Plaintiff subsequently filed suit against the Debtor and an arbitration award was entered in his favor. Ex. C-18

*Actual Fraud*

To the Plaintiff, this series of events demonstrates that he was the victim of fraud. Section 523(a)(2)(A) of the Bankruptcy Code provides that a debt will be held non-dischargeable if it was "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent it was obtained by false pretenses, a false representation or actual fraud." 11 U.S.C. §

5

523(a)(2)(A). The elements of a claim under § 523(a)(2)(A) for fraud are the following: (1) the debtor made a representation knowing at the time that it was false; (2) the debtor made the representation with the intent and purpose of deceiving the plaintiff; (3) the plaintiff justifiably relied on the debtor's false representation; and (4) the plaintiff suffered a loss or damage as a proximate consequence of the representation having been made. *Stevens v. Antonious (In re Antonious)*, 358 B.R. 172, 182 (Bankr.E.D.Pa.2006). "The party seeking to establish an exception to the discharge of a debt [under § 523(a)(2)(A) ] bears the burden of proof ... by a preponderance of the evidence." *Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); *In re McDonald*, 177 B.R. 212, 215 (Bankr.E.D.Pa.1994)

*The Alleged Frauds*

Plaintiff sees a series of discrete frauds perpetrated by the Debtor: first, promising to pay the property insurance premium with the Plaintiff's credit card but not doing so; second, telling the Honda dealer that the Plaintiff's auto insurance was current when it was not; third, telling the Plaintiff that he was an insurance agent when he was, in fact, a broker; fourth, selling the Plaintiff a split policy; and fifth, failing to notify the Plaintiff that he filed for bankruptcy.  T-9, 11-12

*Payment of the Premium*

As to the first charge, the Court notes that there is a premise that the Debtor and Plaintiff do not share. Plaintiff maintains that Debtor was given the power of attorney and his credit card number to pay *all of the Plaintiff's auto premiums*. T-23  Debtor contends that he was instructed to pay *only the liability portion*. T-78  The premium for liability coverage was $98 which is the amount Debtor charged to Plaintiff's credit card.  Ex. C-2; D-104.  If the Court accepts Debtor's version that only the liability premium was to be paid, there was no misrepresentation.

But even accepting Plaintiff's premise, it doesn't necessarily follow that the Debtor misrepresented anything.  The fact that Debtor charged to Plaintiff's credit card only enough to pay Plaintiff's insurance belies fraudulent intent.  *In re Cohn*, 54 F.3d 1108, 1119 (3d Cir. 1995) (explaining that intent is derived from a totality of the circumstances).  It is the Debtor's undisputed testimony that he used Plaintiff's credit card one time to make a charge of $98; that such charge paid for the Plaintiff's liability premium and nothing else; that out of that amount, Debtor stood to profit no more than $3.77; that the Debtor would earn that commission only after the policy had been in force for at least 13 months; and that because the policy would be cancelled within two months he did not profit at all

7

from this transaction. T-92. Needless to say, it is hard to conceive of one designing the elaborate fraud the Plaintiff posits with no profit to be had.

Rather than a "scheme" as Plaintiff would have the Court find, the circumstances suggest the reasonable inference to be that a mis-communication simply occurred: Plaintiff believed that the Debtor knew which policy premium needed to be paid by November 14, but, in fact, he did not. Alternatively, this could be put down to something as simple as error on Debtor's part: he paid the wrong insurance premium. As the Court pointed out at trial, the Debtor used Plaintiff's credit card but one time and such use was not for the Debtor's benefit. T-104  Whatever Debtor's thinking was, it does not suggest deception on his part. Rather, it appears, at most, that a mistake was made.

*Response to Dealer's
Insurance Inquiry*

The same can be said as to the second charge. When asked by the Honda salesman about the state of Plaintiff's insurance, the Debtor undoubtedly gave incorrect information. But the Court would not say that it was *false* information. Something that is false is "intentionally untrue." Black's Law Dictionary, 540 (Fifth Ed.1979). Debtor assumed—wrongly as it turns out— that Plaintiff had property insurance in force because the Debtor had procured that coverage. When he responded affirmatively to the question of coverage, the Court credits the Debtor with having

8

honestly believed that insurance was in place.  He was promptly disabused of that belief by the carrier and could have promptly corrected his error by calling the dealer back to explain what he had just learned from the carrier.  Debtor admits that he should have done this but did not.  T-98  That, however, does not make his first answer a misrepresentation.  Again, it is more in the way of negligence.[4]

*Broker or Agent*

On the question of Debtor being an agent versus a broker, the Court is similarly unpersuaded, albeit for different reasons.  Plaintiff testified that if the Debtor had told him that he was a broker, and not an agent, then the Plaintiff would have obtained insurance elsewhere.  T-19  While never saying so specifically, Plaintiff appears to be implying that he was acting based on the fundamental rule of agency law that the principal is responsible for the acts of his agent.  T-12,13.  Here, that principal would have been the insurer and the agent would have been the Debtor.

---

[4] And it is not dispositive of anything that the Debtor's version of the events of November 21 differs from that of Mr. English, the Honda sales rep who testified on behalf of the Plaintiff.  The Debtor testified that Plaintiff was in his office on that afternoon; that is, when Debtor told Plaintiff that his insurance lapsed and Plaintiff, according to the Debtor, told him that he "would take care of it." Mr. English recalls that the Plaintiff was at the dealership for the whole afternoon.  Mr. English does not say, however, whether the Plaintiff ever left his sight during the long afternoon, and the Debtor's business office was only 20 to 30 minutes away by car.  T-91. For his own part, the Plaintiff never explains how his signature came to be on the insurance transfer paperwork that Debtor prepared and sent to the carriers, although it is dated November 21, 2008.  *See* Ex. D-105

9

The Debtor's failure *qua* agent to have paid the correct premium would have bound the insurer *qua* principal to cover the theft of the Plaintiff's car notwithstanding. *See Wisniski v. Brown & Brown Ins. Co.*, 906 A.2d 571, 578 (Pa.Super.2006) *quoting Couch on Insurance*, § 45:1 (3d ed.2005)(explaining the an insurance agent's principal is the insurer while an insurance broker's principal is the insured); *see also* 31 Pa.Code § 37.1 (drawing substantially the same distinction between "agent" and "broker")

It comes as no surprise to the Court that the parties' testimony on this question is at odds. The Plaintiff testified that the Debtor represented himself to be an agent for the insurers. T-18, 19. The Debtor's testimony on this point is contradictory. On direct examination, he stated that he was a broker, but when cross-examined he stated that he was an agent. *Compare* T-73 with T-93,94. The Debtor's conflicting testimony is unhelpful and so the Court has looked elsewhere in the record. At the beginning of Plaintiff's testimony, the Court finds what it believes to be the most probative evidence as to why Plaintiff actually took his business to the Debtor: the Plaintiff testified that his father referred him to the Debtor; the Debtor and Plaintiff's father had been childhood friends. T-15. The question of whether Debtor was an agent or a broker never came up. Correspondingly, there is no evidence which would explain why the Debtor would intentionally misrepresent his status to the

Plaintiff. The profit Debtor stood to gain from this alleged fraud–de minimis as it was–did not depend on whether the Debtor was a broker or agent. Based on this, the Court finds that the Plaintiff did not rely on any misrepresentation by the Debtor of his status as an agent versus a broker.

*Split Policy*

The Plaintiff insists that the Debtor intended to harm him by selling him a "split" policy. T-100. His counsel describes this structuring of Plaintiff's auto insurance as a "cockamamy scheme." *Id.* But the Debtor offered a logical explanation for this arrangement: it saved Plaintiff some money. T-75,76. To be sure, it was incumbent upon the Debtor to fully explain to the Plaintiff that he would be paying two insurers. However, the failure to have done so hardly establishes deceit.

*Notice of Bankruptcy*

Finally, while the Debtor should have notified the Plaintiff of his bankruptcy when it was filed, which he did not, the Plaintiff has pointed to no resulting prejudice. T-37  The Court granted Plaintiff's Motion to Re-Open the Debtor's bankruptcy so that Plaintiff could file his claim for non-dischargeability. And, in fact, the Plaintiff's case has now been tried. While this may be the one instance in this case where the Debtor may have been less than honest, the Court does not see how Plaintiff was harmed thereby. In short, the record in this case does not

demonstrate fraud or misrepresentation on the Debtor's part.

*Section 523(a)(4)*

In his opposition to Debtor's Motion to Dismiss, the Plaintiff explained that his alternative ground for nondischargeability is § 523(a)(4). That section provides, in pertinent part that "[a] discharge under section 727 … of this title does not discharge an individual debtor from any debt … for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4). The Court has previously held that the Complaint stated a claim for both fiduciary fraud as well as embezzlement. *See In re Ishmael*, 2008 WL 80040 *1 (Bankr.E.D.Pa.). However the Plaintiff has failed to offer sufficient evidence to support those claims.

*Fiduciary Fraud*

Beginning with fiduciary fraud, the Court observes that Pennsylvania law recognizes that a power of attorney establishes a fiduciary relationship. *See* 20 P.S. § 5601(e) ("An agent acting under a power of attorney has a fiduciary relationship with the principal.") The Plaintiff executed a Power of Attorney charging Debtor with the duty of attending to his auto insurance needs. Ex. C-1; D-103. That supports a finding of a fiduciary relationship between the parties. *See Graves v. James (In re James)*, 94 B.R. 350, 353 (Bankr.E.D.Pa.1988) (finding that insurance agent who misappropriated payments from client was a

12

fiduciary)

But the second part of this claim requires fraud on the agent's part. This Court has found, *supra,* that no such fraud occurred. As a result, while the Debtor may have been the Plaintiff's fiduciary, he did not defraud him.

*Embezzlement*

Equally wanting is any evidence to support a claim of embezzlement. That tort is defined as the "'fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come.'" *Borchardt v. Ferrell (In re Ferrell),* 2006 WL 1997423 *9 (Bankr.E.D.Pa.) (*quoting Moore v. United States,* 160 U.S. 268, 269 (1895)). To prove a debtor committed embezzlement within the meaning of § 523(a)(4), a plaintiff must establish that: (1) the debtor was entrusted; (2) with property; (3) of another; (4) which the debtor appropriated for his own use; and (5) with fraudulent intent. *Ginsburg v. Birenbaum (In re Birenbaum),* 2006 WL 199478 *8 (Bankr.W.D.Pa.).

The record establishes the first three elements. Pursuant to the Power of Attorney and their telephone conversation of November 12, Plaintiff entrusted to the Debtor his credit card to make the required payment. That, however, is as far as the record goes in Plaintiff's favor. The Court has already found that the Debtor did not appropriate the card for his own use, but

13

instead, used it, erroneously perhaps, to pay the wrong insurance premium on behalf of the Plaintiff.  Moreover, the Court has found a lack of fraudulent intent on Debtor's part in obtaining the Power of Attorney and in using the credit card as he did.  There is simply insufficient evidence in the record to support a claim of embezzlement.

*Summary*

The thread which runs through this record is Debtor's careless handling of the Plaintiff's insurance needs.  He appears not to have clearly and fully explained to Plaintiff how that insurance would be structured.  He may have failed to ascertain precisely which policy needed to be paid when Plaintiff asked for his help in making a payment.  He gave out incorrect information as to the status of Plaintiff's coverage without first checking the accuracy of that information.  And when he learned of that mistake, he failed to correct it.  Still, given all of this, his conduct at worst indicates negligence.[5]  It does not support a charge of fraud, fiduciary or actual, or embezzlement.  Plaintiff's claims for non-dischargeability under either § 523(a)(2) or (4) of the Bankruptcy Code thus fail.  Accordingly, judgment shall be entered in favor of the Debtor and against the

---

[5] The Court observes from the record that the arbitration award in Plaintiff's favor in the state court is based on breach of contract. Ex. C-18.  The Court underscores this to emphasize that as a consequence the Court can ascribe no preclusive effect to that ruling in this proceeding, which is based in tort.

Plaintiff.

An appropriate Order follows.

By the Court:

*Stephen Raslavich* (signature)

_____
Stephen Raslavich
United States Bankruptcy Judge

Dated:    November 21, 2008